# United States Court of Appeals
## For the First Circuit

Nos. 07-2193, 07-2255, 07-2759, 07-2777

CITY OF BANGOR,

Plaintiff, Appellee,

v.

CITIZENS COMMUNICATIONS COMPANY,

Defendant/Third-Party Plaintiff, Appellee,

v.

UGI UTILITIES, INC.; CENTERPOINT ENERGY RESOURCES CORP., ET AL.,

Third-Party Defendants,

BARRETT PAVING MATERIALS INC.; HONEYWELL INTERNATIONAL INC.; BEAZER
EAST, INC.; DEAD RIVER COMPANY,

Third-Party Defendants, Appellants,

v.

SOCIÉTÉ ROUTIÈRE COLAS, S.A.,

Fourth-Party Defendant, Appellant,

ROBINSON SPEIRS, JR.; JULIE ANN MACMANNIS; NANCY S. DAWSON;
ELIZABETH H. SPEIRS; MARY S. PRICE; ROBINSON SPEIRS,

Fourth-Party Defendants, Appellants.


STATE OF MAINE; MAINE DEPARTMENT OF ENVIRONMENTAL PROTECTION,

Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, <u>U.S. District Judge</u>]

Before

Lynch, <u>Chief Judge</u>,
Merritt,[*] <u>Senior Circuit Judge</u>,
and Howard, <u>Circuit Judge</u>.

Gregory A. Bibler with whom <u>Paul E. Nemser</u>, <u>Francis G. Kelleher</u>, <u>Christophe G. Courchesne</u>, and <u>Goodwin Procter LLP</u> were on brief for Honeywell International Inc.
<u>Robert S. Frank</u> with whom <u>Harvey & Frank</u> was on brief for Dead River Company.
<u>William B. Devoe</u> with whom <u>Eaton Peabody</u>, <u>W. Scott Laseter</u>, and <u>Kazmarkek Geiger & Laseter LLP</u> were on brief for City of Bangor.
<u>John S. Hahn</u> with whom <u>Jay C. Johnson</u>, <u>Mayer Brown LLP</u>, <u>Martha C. Gaythwaite</u>, and <u>Friedman, Gaythwaite, Wolf & Leavitt</u> were on brief for Citizens Communication Company.
<u>Mary M. Sauer</u>, Assistant Attorney General, with whom <u>Paul Stern</u>, Deputy Attorney General, and <u>G. Steven Rowe</u>, Attorney General, were on brief for State of Maine and Maine Department of Environmental Protection.
<u>John P. McVeigh</u>, <u>David B. Van Slyke</u>, and <u>Preti Flaherty Beliveau & Pachios LLP</u> were on brief for Barrett Paving Materials, Inc.
<u>Michael Kaplan</u> and <u>Preti Flaherty Beliveau & Pachios LLP</u> were on brief for Société Routière Colas, S.A.
<u>Jeffrey A. Thaler</u> and <u>Bernstein, Shur, Sawyer & Nelson</u> were on brief for Beazer East, Inc.
<u>Samuel W. Lanham, Jr.</u> and <u>Lanham & Blackwell</u> were on brief for Robinson Speirs, Elizabeth H. Speirs, Mary S. Price, Nancy S. Dawson, Julie Ann MacMinnis, and Robinson Speirs, Jr.

July 9, 2008

---

[*]    Of the Sixth Circuit, sitting by designation.

**LYNCH**, **Chief Judge**. This case concerns responsibility for the cleanup of the contamination of the bed of Penobscot River in Bangor, Maine, known as Dunnett's Cove, under the federal Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq.

Specifically, we are being asked to overturn the district court's approval, after nearly five years of litigation, of a Consent Decree which allocates certain responsibilities among defendant Citizens Communications Company, the plaintiff City of Bangor, and the intervenor State of Maine (including the Maine Department of Environmental Protection ("DEP")). City of Bangor v. Citizens Commc'ns Co. (Bangor II), No. 02-183, 2007 WL 1557426 (D. Me. May 25, 2007). The appellants are non-settling third and fourth parties who are said to be potentially responsible parties. We are also being asked to order the district court, which has not ruled on the question of the non-settling parties' liability, to enter judgment in favor of the appellants on a particular theory.

The United States, through the Environmental Protection Agency, is not and has never been a party in this action, unlike in most CERCLA actions. We consider whether the absence of the United States affects the standard of review of the Consent Decree and conclude that it does. We affirm the Consent Decree and other orders being challenged.

I.

A fairly extensive discussion of the background of the case is required.

A.      Original Complaint

The City of Bangor initially filed a cost recovery suit in 2002 under the private plaintiff provisions of CERCLA, 42 U.S.C. §§ 9607, 9613, against Citizens Communications Company. Citizens filed a counterclaim against Bangor, claiming that the City was responsible for some of the contamination, and filed complaints against numerous third parties.

The City's complaint alleged Citizens is a potentially responsible party ("PRP") for the contamination from the manufactured gas plant ("MGP" or "Site"), which operated in Bangor from approximately 1851 to 1963. In 1948 Citizens merged with the Bangor Gas Company, then the owner of the MGP, and succeeded to and assumed all liability relating to the MGP. Citizens sold the Site to the Maine Utility Gas Company in April 1963. In 1978, the City of Bangor took the property through eminent domain. The complaint alleged that the City had expended over $1.125 million in investigative and cleanup costs and had suffered from the property's diminished value.

The complaint alleged the MGP discharged tar, tar-laden wastewater, and other byproducts into the Penobscot River through a stone sewer that ran beneath the Site and emptied into the river,

and that various construction activities at the Site contributed to the contamination.

The complaint alleged that those hazardous waste discharges created a tar slick on the bottom of the Penobscot River that begins at the outfall of the stone sewer and extends at least 1500 feet downstream. As a result, globules from the tar slick periodically "bubble to the surface and coat boats, docks, bridges and the shoreline in the vicinity . . . . These and other releases from the tar slick emit hazardous and toxic chemicals that are potentially harmful to humans and numerous aquatic species." Hazardous wastes from the Site allegedly have also contaminated the soil beneath an adjacent playground and other nearby properties.

The complaint sought cost recovery under CERCLA section 107, 42 U.S.C. § 9607, and a declaration that Citizens was jointly and severally liable for all future cleanup costs. In the alternative, the City sought a declaration under CERCLA section 113, id. § 9613, that Citizens would be responsible for an equitable share of all future cleanup costs. The City also sought relief under Maine statutory and common law.[1]

---

[1] The City claimed that the Site constituted a public and private nuisance under the State's nuisance statute, Me. Rev. Stat. Ann. tit. 17, § 2701, and common law, and it sought injunctions under both the statute, id. § 2702, and common law. The City also asserted claims for strict liability for ultrahazardous or abnormally dangerous activity and negligence, and it sought declaratory judgment on its common law and statutory nuisance claims and punitive damages of at least $50 million.

B.        Early Proceedings and Complaints Against Third and Fourth Parties

Citizens filed an answer on December 26, 2002, arguing, inter alia, that because the City is a responsible party, it cannot maintain any claims against Citizens under CERCLA section 107. Citizens also filed a counterclaim, alleging that the City was responsible for contamination of Penobscot River and qualified as a "responsible person" under CERCLA, id. § 9607(a), and so was responsible for an equitable share of response costs under CERCLA, id. § 9613(f)(1).

Bangor filed an Amended Complaint on April 17, 2003 that added the State of Maine to the case caption as a purported "party-in-interest" and asserted additional claims against Citizens under a provision of the federal Resource Conservation and Recovery Act ("RCRA"), id. § 6972(a)(1)(B).[2] Citizens opposed adding the State as a party, arguing that this "method of adding a new party was completely improper" and that the State's inclusion "would merely add confusion to the proceedings." The State sent a letter to the court saying it had two interests in the litigation: from its

_____

[2] RCRA governs the "treatment, storage, and disposal of solid and hazardous waste." Meghrig v. KFC W., Inc., 516 U.S. 479, 483 (1996). RCRA differs from CERCLA because its primary purpose is not to promote the cleanup of toxic waste sites or to compensate those involved in the remediation of such sites, but rather "to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated." Id. The provisions of RCRA are not at issue in this appeal.

regulatory authority over uncontrolled hazardous waste sites, and from the State's property interest in the river bed on which a portion of the tar plume rests. The State indicated that it believed its status "is correctly denominated as a 'party-in-interest.'"

On August 6, 2003, the district court granted Citizens's Motion To Strike or Drop the State of Maine as a Party. The court rejected Bangor's suggestion that the court use its equitable powers to allow the State to participate as a "party-in-interest," holding that Bangor had not demonstrated any legal authority for its doing so. The court suggested that if the State wanted to participate, it should either intervene under Fed. R. Civ. P. 24 or request to be included as an amicus curiae. Alternatively, the court noted that the plaintiff, Bangor, could move to join the State under Fed. R. Civ. P. 20. Bangor did not do so.

In the interim, on April 30, 2003, Citizens filed third-party complaints, under Fed. R. Civ. P. 14, 19, and 20, against Barrett Paving Materials, Inc.; the U.S. Army Corps of Engineers; Guilford Transportation Industries, Inc.; Honeywell International Inc.; S.E. MacMillan Company, Inc.; Dead River Company; Northwestern Growth Corporation; UGI Utilities, Inc.; North American Utility Construction Corp.; Beazer East, Inc.; and Centerpoint Energy Resources Corp., seeking contribution and/or indemnity for any environmental cleanup costs for which it might be

held liable. On August 26, 2003, Citizens filed an additional third-party complaint against Maine Central Railroad Company. Various fourth parties were added.[3] Bangor filed a Second Amended Complaint on October 22, 2003, which did not seek to add any additional parties.

C.        Motions for Summary Judgment

On October 24, 2003, Citizens moved for partial summary judgment under CERCLA section 107 on the grounds that the City was a responsible person and therefore unable to bring a joint liability claim under this provision of CERCLA.

On November 18, 2003, the U.S. Army Corps of Engineers filed a motion for partial judgment on the pleadings, arguing that Citizens had no claim for contribution against it because Citizens was potentially liable only for its equitable share, and parties facing only equitable liability cannot bring contribution claims.

---

[3]    On October 2, 2003, Dead River Company filed a fourth-party complaint against Robinson Speirs, Elizabeth H. Speirs, Mary S. Price, Nancy S. Dawson, Julie Ann MacMannis, and Robinson Speirs, Jr., alleging that when these defendants sold Bacon & Robinson Co. to Dead River Company in 1976, they covenanted and warranted that they were responsible for any undisclosed obligations of Bacon & Robinson Company.

On November 10, 2003, third party Honeywell International Inc. filed a fourth-party complaint against Société Routière Colas, S.A., asserting that Colas had agreed to indemnify Honeywell's predecessor against environmental claims asserted after November 28, 1978.

Third and fourth parties Barrett Paving, Honeywell International, Beazer East, Dead River Company, Colas, and the Speirs parties collectively refer to themselves as "non-MGP" parties because they had no connection to the operation of the MGP.

On March 11, 2004, the magistrate judge recommended granting Citizens's motion for partial summary judgment on the ground that Bangor was precluded from obtaining a full recovery under CERCLA section 107 because it was a PRP. City of Bangor v. Citizens Commc'ns Co., No. 02-183, 2004 WL 483201, at *1 (D. Me. Mar. 11, 2004).[4]

The magistrate judge also recommended granting the Army Corps's motion on the grounds that Citizens was potentially liable to Bangor only to the extent of its equitable share in the City's cleanup costs and therefore had "no legal basis to seek contribution from third-parties." City of Bangor v. Citizens Commc'ns Co., No. 02-183, 2004 WL 483202, at *1 (D. Me. Mar. 11, 2004). The district court subsequently adopted these recommendations. City of Bangor v. Citizens Commc'ns Co., No. 02-183, 2004 WL 1572627, at *1 (D. Me. May 7, 2004).

D.        Stay and Bifurcation of Third-party Claims

We spend some time on this matter because it directly affects one of the appellants' key objections to the court's later actions.

On March 30, 2004, the magistrate judge issued an order, embodying an agreement by the parties, staying all discovery deadlines relating to the third- and fourth-party actions,

_____

[4]    This is no longer the law after United States v. Atlantic Research Corp., 127 S. Ct. 2331 (2007), which held that PRPs can recover incurred cleanup costs under section 107. Id. at 2236-38.

-9-

including deadlines to make expert witness designations. On May 14, 2004, the magistrate judge ordered that the stay of discovery would remain in effect as to third-party claims, and also noted that "[t]he parties are not yet sure if one or more of them might be opposed to bifurcation, and no final decision has been made in that regard."

On July 6, 2004, the magistrate judge ruled on a second summary judgment motion filed by Citizens, in which Citizens sought judgment with respect to all remaining counts in Bangor's Second Amended Complaint. City of Bangor v. Citizens Commc'ns Co., No. 02-183, 2004 WL 1572612 (D. Me. July 6, 2004). The magistrate judge recommended granting the motion with respect to state law claims involving private nuisance, strict liability for ultrahazardous activity, and punitive damages, and denying the motion with respect to all other claims. Id. at *11.

The magistrate judge's opinion recommended bifurcation:

> [A]t the conclusion of the hearing counsel for [a third-party defendant] expressed concern whether the court envisioned that litigation between Citizens and the City would be binding against third-party defendants, who were essentially sidelined from this litigation in connection with the prior entry of judgment against Citizens's third-party CERCLA action against the Army Corps of Engineers and my order, entered by consent, staying discovery of third party experts. . . . I would recommend at this juncture that the court bifurcate this case and proceed solely on the action between the City and Citizens.

Id. at *10.

The recommendation was adopted in whole by the district court, without objection. City of Bangor v. Citizens Commc'ns Co., No. 02-183, 2004 WL 2823211, at *1 (D. Me. Oct. 14, 2004). Discovery remained stayed as to third parties pending resolution of the initial phase of the trial.

In a joint memorandum requested by the court and filed on November 2, 2004, the parties agreed that the case would proceed in three phases, not two. Phase One would be a trial between Bangor and Citizens regarding Bangor's liability claims, Citizens's affirmative defenses and counterclaims, and Citizens's equitable share of responsibility. In Phase Two, the court would determine "the appropriate remedy, if any, to address tar in the Penobscot River." If a third phase were necessary, it would consist of a trial to determine the third parties' liability to Citizens.

In this memorandum, Citizens also took the position that findings and determinations in the first two phases of the case should be binding in the third phase involving the third parties. On February 17, 2005, the court declined to address any issues involving the third parties, noting that "[t]his matter is scheduled to proceed to trial in May on a bifurcated basis, without participation by third parties. At best, the action remaining against any third party is purely hypothetical in any event, given the court's prior rulings. Therefore [Citizens's] motion all but asks for an advisory order binding those potential third-party

-11-

defendants in an action that cannot even be contemplated under the current state of the record."

E.        Phase One Trial and Findings

A twelve-day Phase One bench trial was held in September 2005.  The third and fourth parties did not participate.  On June 27, 2006, the district court issued its Findings of Fact and Conclusions of Law ("Phase One Findings and Conclusions").  City of Bangor v. Citizens Commc'ns Co. (Bangor I), 437 F. Supp. 2d 180 (D. Me. 2006).  See Fed. R. Civ. P. 52(a).

The district court made the following findings of fact and conclusions of law.  Bangor had incurred approximately $1,000,000 in costs during the course of investigating the tar contamination in Dunnett's Cove.  Bangor I, 437 F. Supp. 2d at 196. The primary source of the hazardous levels of polycyclic aromatic hydrocarbons ("PAHs") in Dunnett's Cove is tar.  Id. at 200.  "[I]t is more likely than not that during most, if not all, of its operating life, the Bangor MGP discharged tar-laden wastewater into Dunnett's Cove via the Old Stone Sewer . . . [which] contributed to the PAH contamination in Dunnett's Cove."  Id. at 201.  The operations of a nearby railyard, which occurred between 1854 and 1986, are more likely than not a source of the contamination in Dunnett's Cove, and "[t]he City's use of and construction on the Railyard property since 1996 has likely contributed to the movement of PAH contamination from the Railyard property into Dunnett's

-12-

Cove."  Id. at 204.  "[O]ther discharges via the Old Stone Sewer, besides those from the Bangor MGP and the Railyard . . ., contributed to the tar contamination and elevated PAHs that are now found in Dunnett's Cove."  Id. at 206.  However, these discharges are "likely consistent with what the experts referred to as 'urban background' and, as such, these discharges more likely than not account for only a relatively small portion of the tar and elevated PAHs that will inevitably be addressed in any cleanup of the site."  Id.

The court concluded that Citizens was liable under RCRA as a past generator of the solid waste now found in the intertidal zone and the northern portion of Dunnett's Cove.  Id. at 211.  As a result, the court noted that it could enter an injunction requiring Citizens to abate any imminent and substantial endangerment that exists in Dunnett's Cove, and also could award Bangor any appropriate costs of litigation, including attorneys' fees and expert witness fees.  Id.

The court determined that Bangor was also liable under RCRA because it "contributed to the past handling and disposal of solid waste" in the intertidal zone and the northern portion of Dunnett's Cove.  Id.  As a result, the court noted that it could enter an injunction requiring Bangor to abate any imminent and substantial endangerment and award Citizens appropriate costs of litigation.  Id.  The court concluded that under RCRA, Citizens and

-13-

Bangor were jointly and severally liable to carry out the directives of a mandatory injunction that would abate the substantial and imminent endangerment presented by tar contamination in Dunnett's Cove. Id. at 219.

The court further concluded that the PAHs in Dunnett's Cove qualify as "hazardous substances" under CERCLA. Id. at 211. Because Bangor owns an intertidal zone portion of the Dunnett's Cove facility and because it arranged for the disposal of tar into Dunnett's Cove, the court found it liable under CERCLA. Id. Because Citizens succeeded to the liability of the Bangor Gas Light Company and Bangor Gas Works, the court also found it liable under CERCLA. See id. at 212.

Having considered all of the evidence at trial and the factors set out in In re Hemingway Transport, Inc., 993 F.2d 915, 921 n.4 (1st Cir. 1993), the court concluded, within the limitations of the Phase One inquiry, that Citizens's share of responsibility under CERCLA should be sixty percent and assigned the remaining equitable share of forty percent to Bangor. Bangor I, 437 F. Supp. 2d at 212. This ratio was to apply to previously incurred as well as to future response costs. Id. at 213. The court explained that

> [t]here is a distinction between resolving the
> question of whether the Bangor MGP is a source of
> the contamination in question and the more general
> inquiry of determining all of the sources for PAH
> contamination in Dunnett's Cove. In the context of
> this first phase trial, it was never contemplated

-14-

that the parties or the Court would attempt to definitively answer the latter, more general inquiry, although it was inevitable that the Court would make some findings that address this question. Despite these related findings, further discussion of the other sources is unnecessary and inappropriate.

Id. at 214.

The court made clear that its finding that there were two parties responsible for the contamination was limited and only "[i]n the context of this first phase trial." Id. The court noted that if it "were ultimately presented with each and every entity that could be responsible for some amount of tar and/or PAHs now found in the Cove, the complicated process of weeding out multiple 'de minimis' polluters and then making an equitable allocation among all remaining parties would involve a complicated trial involving many months, if not years." Id. at 224.

The court further explained that "[a] relatively small portion of the City's share, five percent or less, reflects the City's role in contributing to the Bangor MGP discharge . . . . Another slightly greater portion . . . reflects the equitable share that might be assigned to other potentially responsible parties that the City has chosen not to pursue and for whom the City does not serve (and has not served) as a subsequent owner of the property. Finally, the bulk of the City's forty percent share reflects its role as current owner of other properties that have contributed to the contamination." Id. at 225. The court noted

that although previous property owners might have played a more significant role in causing the contamination, "the City has chosen not to pursue these previous owners. Even if the City had pursued these previous owners, the City would likely still be assigned some equitable share for these properties . . . both because of its current role as owner and because of its subsequent use and construction on these properties." Id. at 225-26.

The court also discussed the possibility of assigning an equitable share to each liable parent corporation of Citizens which was responsible for operations of the MGP prior to November 1948. See id. at 226-27. In doing so, it made clear that "although the Court is now opening the door of potential third-party liability to Citizens, it is doing so on a limited basis. The Court has not assigned to Citizens any 'orphan shares' . . . . Thus, the only third parties that might be liable to Citizens are those that are proven to share in the responsibility of the operation of the Bangor MGP some time prior to 1963." Id.

Significantly, the court stated that "no final judgment will be entered as [of] this time," and instructed the parties to determine the best way to move forward while the action was stayed. Id. at 227.

F.    Stay and Settlement Discussions Among Phase One Parties

During the stay that followed, Bangor and Citizens informed the court that they were "actively engaged in efforts to

craft a remedy for the environmental problem at issue in this litigation" that would comport with the court's Findings and Conclusions and also be acceptable to Maine, with whom they had been holding meetings. The parties also reported that they had "held multiple meetings and conference calls to discuss the possibilities of settling all issues between them which, if successful, would leave only claims against the Third Parties for possible resolution by the Court in a Phase III trial." They noted that no third parties had participated in these discussions. The court continued to extend the stay throughout the end of 2006 in order to allow the participating parties to continue negotiations and attempt to "reach[] an efficient global resolution of this matter."

Faced with the prospect that the Phase One parties and the State might settle, the third- and fourth-party defendants became active. On December 18, 2006, third-party defendants Barrett Paving and Honeywell International and fourth-party defendant Colas filed a motion for judgment, arguing that the court's Findings and Conclusions limited Citizens's responsibility to its equitable share and there were therefore no remaining claims against them since "Citizens has made claim against Barrett and Honeywell only for such share of liability as the Court may assign to Citizens that exceeds its equitable share." Citizens filed an opposition, arguing that the motion for judgment was improper

-17-

because "all proceedings concerning the moving parties have been stayed and bifurcated from the active dispute between the City and Citizens, and . . . the dispute between the City and Citizens has itself been stayed."

On January 18, 2007, the court extended the stay until February 16. On February 16, Bangor and Citizens submitted a joint status report indicating that they had executed a Settlement Agreement and were in the process of finalizing a Consent Decree with the State and the State DEP. The report noted that Bangor and Citizens had "met and conferred with DEP and representatives of the Attorney General's office on multiple occasions, and have exchanged multiple drafts of the Consent Decree." It indicated that the State had no objection to the "basic terms on which Citizens had agreed to settle," and the main issues still to be resolved "center around the specific procedures under which the City ultimately will finalize the selection of the remedy with DEP at some later date."

On February 23, Citizens and Bangor submitted a joint status report proposing a schedule for the Phase Three, or third-party, liability determinations. They noted that the determinations to be made included whether each of the third-party defendants qualified as a liable party under CERCLA section 107(a) and what responsibility the third parties should bear under the principles of equitable allocations.

On March 5, 2007, third-party defendants Maine Central Railroad Company and Guilford Transportation Industries filed a motion to dismiss, and third-party defendants Dead River Company and Beazer East filed separate motions for judgment on the pleadings. Citizens objected to all of these motions, noting that "the Third Party Motions rely heavily on the Court's initial Findings of Fact and Conclusions of Law from the first phase trial. But those findings have not been entered as a final judgment, and cannot properly serve as a basis for the Third Party Motions. Moreover, the Court's findings actually point toward, not away from, the third parties' liability . . . ."

G.        Involvement of and Intervention by the State

The State did not respond until April 12, 2007 to the district court's August 2003 suggestion that, if it wanted to participate in the case, it ought to request to intervene or to be included as an amicus curiae. Maine in April 2007 filed a motion to intervene. See Fed. R. Civ. P. 24.

The State's motion described the State's involvement in the case as follows: Starting in 2001, the DEP oversaw a remedial investigation of the Site. On March 3, 2004, the DEP issued an Uncontrolled Site Designation stating that the tar deposit in Dunnett's Cove and/or the PAHs in this deposit are hazardous substances and the Site is an "uncontrolled hazardous substance site" as defined in the Maine Uncontrolled Sites Law. In 2004,

-19-

Bangor and Citizens jointly engaged a consulting firm, which on March 15, 2004, submitted a Feasibility Study Report to the DEP that recommended several remedies for the Site. On August 17, 2005, the DEP issued a letter accepting these proposed remedies and a Decision Document that identified its selected remedies. Following the district court's issuance of the Phase One Findings and Conclusions in June 2006, the DEP renewed its discussions with Bangor and Citizens regarding remedies for the Site. The parties did not reach an agreement on remedies but did reach an agreement regarding the process by which remedies would be proposed and evaluated, and this agreement was contained in a Consent Decree the parties would submit to the court separately.

The State argued that it could intervene as of right[5] because its interests would be "directly and irrevocably affected" by the court's decision regarding the remedy phase of the underlying lawsuit between Bangor and Citizens, both because it owns the submerged lands underlying the Penobscot River and because it has the power and responsibility to oversee the cleanup of hazardous waste sites. The State argued that its interests could not be adequately represented by either Bangor or Citizens because "these parties are obligated to pay for the remedial actions and therefore have a potential conflict of interest regarding the

---

[5]     Alternatively, it sought permissive intervention.

selection of . . . remedies," and also because the State's police power cannot be delegated to a third party.

Various third and fourth parties opposed the State's motion to intervene, arguing that (a) it was untimely because it came four years after the State declined specific invitations to join the proceeding as a party; (b) the State had failed to file a complaint with its motion to intervene as required by Fed. R. Civ. P. 24(c); and (c) "the State's intervention raises the very real specter that new claims will be filed, additional parties joined, and many more years of discovery and other pretrial proceedings will be commenced." The State responded that it could not have filed a motion for intervention before the agreement embodied in the Consent Decree was reached, and that the motion and proposed Decree "identify the State's causes of action and the parties against whom the State is asserting claims."

On May 25, 2007, the district court granted the State's motion to intervene. Bangor II, 2007 WL 1557426, at *4. The court held that the State's interests would not be adequately represented by the other parties involved, and that although it was "puzzling to the Court that the State decided to wait approximately four years to intervene," it was also true that "the State has acted expeditiously since learning how its interests were imperilled by the Court's June 27, 2006 decision." Id. at *3. The court also ruled that "the State's representation that it 'will take no action

-21-

in this case against any of the third or fourth parties' suggests that its intervention will either have no impact on the Third Parties or may serve to consolidate and simplify any attempts to hold any third or fourth party liable for remediation of the site." Id. at *4. The court further held that under the "unique circumstances" of this case, "the Court believes it is a proper exercise of its discretion to excuse the State's failure to file a pleading and rely on the presented record in considering the merits of the claims that serve as the basis for the State's request to intervene." Id.

H.      Consent Decree

Meanwhile, on April 11, 2007, Bangor, Citizens, and the State, as a proposed intervenor, filed a proposed Consent Decree. The Decree specified that the parties' underlying agreement was "premised upon the Court's approval of all material terms" of the Decree on or before June 15, 2007.

Under the terms of this Decree, Maine covenanted not to sue or take administrative action against Citizens under federal or state laws, including common law, for contamination at the Site, "whenever such claims may have arisen or arise in the future." The covenant included claims based on natural resource damage and future response actions.

The State gave Bangor a release from liability which was limited to "any matter relating to Existing Contamination at the

Site and the work covered by this Decree" and "recovery of all past and future Response and Oversight Costs." The DEP reserved all rights against the City, but not Citizens, for natural resource damage. It also reserved the right to institute proceedings to modify the Decree to compel Bangor or its successors, but not Citizens, to perform further response actions or to reimburse the DEP for additional response and oversight costs if new conditions at the Site were discovered or new information came to light indicating that the remedial action outlined in the Decree was insufficient.

Bangor and Citizens waived all claims against the State and the DEP regarding existing contamination at the Site and work covered by the Decree. Significantly as to the third- and fourth-party defendants, they "reserve[d] all rights and defenses that each or either of them may have in law or in equity for any claims or causes of action against any non-party to this Decree." This meant they could seek contribution from the parties who were not signatories.

Citizens and Bangor also sought protection from all contribution actions or claims for matters covered by the Decree, such that "neither the City nor Citizens shall be liable for claims for contribution brought by any party, or for any claims whatsoever brought by any other potentially responsible party."

In exchange, Citizens agreed to make payments to Bangor, inter alia, for the costs of remedial actions. Bangor assumed any and all of Citizens's liabilities relating to the Site. Bangor assumed sole responsibility for performing remedial action at the Site, which was to be performed under the supervision of the DEP and according to terms and conditions set forth in the Decree. The provision assigning Bangor responsibility contained the express provision that "this assumption of sole responsibility by the City shall in no way relieve any person or entity not party to this Consent Decree from liability, or prevent the City or its assignees from pursuing claims against those parties relating to the Existing Contamination."

The remainder of the Decree outlined Bangor's specific responsibilities regarding remediation of the Site. These provisions called for extensive involvement by the DEP, which was to receive frequent plans and reports and was required to approve the Projects Operation Plan before its implementation.

I.      Settlement Agreement

The Decree stated that there was a separate Settlement Agreement between Citizens and Bangor. The State was not a party to the Settlement Agreement.

Though not submitted by the Decree signatories, the Agreement was submitted to the court by third and fourth parties. The Agreement contained terms that "set out with particularity the

obligations and covenants" between Bangor and Citizens, and those terms would ultimately govern each party's relative share of responsibility. The court considered some of the terms of the Settlement Agreement in considering the approval of the Consent Decree.

The Settlement Agreement stipulates that within fifteen days of its effective date, Citizens is to pay $7.625 million into an escrow account. Bangor assigns to Citizens any and all claims it had or may have had against third parties with respect to the Site. If any of the third parties were to pay any amount to resolve a claim, Citizens can deduct all related expenses, and remaining proceeds are to be divided two-thirds to Citizens and one-third to the escrow account. If any remedial work at the Site is performed with a federal appropriation, Citizens will receive a refund from the escrow account equal to two-thirds of the cost of that remedial work.

J.        Ensuing Claims Against Third-Party Defendants

On April 12, 2007, before approval of the Decree, Citizens filed a motion for leave to file supplemental third-party complaints. Citizens asserted that its settlement with the City gives rise to two new sets of claims under CERCLA section 113(f)(3)(B). This section provides that a person who has resolved its liability to a state for some or all of a response action can seek contribution from persons who are not parties to the

settlement. <u>See</u> 42 U.S.C. § 9613(f)(3)(B). Under this provision, Citizens sought to file supplemental claims based both (1) on any amount that it agreed to pay under the Consent Decree which was above and beyond its fair share of liability and, (2) because Bangor was assigning its third-party claims to Citizens, on the amount that the City agreed to pay above and beyond its fair share of liability.

K.        <u>Court's Approval of Consent Decree</u>

On April 13, 2007, the district court ordered expedited briefing on the motion for entry of the Consent Decree. The court also ordered that copies of the proposed Consent Decree be published in the <u>Bangor Daily News</u> and on the DEP's website. This was done. The court also ordered that public comments be filed promptly with the court. The court declined then to rule on Citizens's motion to file supplemental third-party claims and the pending motions for judgment by third parties.

On May 25, 2007, in the same order in which it permitted the State and the DEP's motion to intervene, the court approved and ordered the entry of the Consent Decree, as amended, as a partial final judgment. The court postponed ruling on other pending motions, including the motions for judgment filed by various third parties and Citizens's motion for leave to file supplemental third-party complaints. <u>Bangor II</u>, 2007 WL 1557426, at *1.

The district court assessed the proposed Consent Decree to determine whether it was fair (including both procedural and substantive fairness), reasonable, and consistent with the purpose of CERCLA. The court noted that in making this inquiry, it had to "acknowledge 'the wide range of potential problems and possible solutions' and thereby leave it to the parties to resolve 'highly technical issues and relatively petty inequities.'" Id. at *6 (quoting United States v. Cannons Eng'g Corp., 899 F.2d 79, 85-86 (1st Cir. 1990)).

As for procedural fairness, the district court noted that it should "look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance." Id. (quoting Cannons, 899 F.2d at 86) (internal quotation marks omitted). Meanwhile, it focused the substantive fairness inquiry on "concepts of corrective justice and accountability," which can include a comparison of the proportion of total costs to be paid by the settlers with the proportion of liability attributable to them. Id. at *7 (quoting United States v. Charles George Trucking, Inc., 34 F.3d 1081, 1088 (1st Cir. 1994)) (internal quotation marks omitted). As for the reasonableness inquiry, the court noted that this circuit "has explicitly called upon the Court to look at the following factors: (1) the 'technical adequacy' or 'efficaciousness [of the decree] as a vehicle for cleansing the environment;' (2) 'whether the settlement satisfactorily compensates the public for the actual

(and anticipated) costs of remedial and response measures;' and (3) 'the relative strength of the parties' litigation positions.'" Id. at *8 (quoting Cannons, 899 F.2d at 89-90). The court did so.

The district court pointed out that under the terms of the Consent Decree and underlying Settlement Agreement, Citizens would pay $7.625 million into an escrow account. It described the arrangement as follows:

> Citizens also has agreed to continue to pursue other third parties, which it continues to believe are responsible for contributing the contamination in the Cove. To that end, the Settlement Agreement assigns to Citizens any claims that the City might have against Third Parties related to the Site. The City, for its part, has agreed to be responsible for the actual remediation of the Site, which will require it to work closely with the State to finalize and implement a remediation plan. Under the terms of the Consent Decree, the City is financially responsible for the cost of remediation to the extent it exceeds the balance of the escrow fund.

Id. at *5. The court noted that the figure of $7.625 million represented the "upper limit" of what Citizens could pay, since under the Settlement Agreement, Citizens could end up recouping some of this amount because of its right to receive a refund from the escrow fund equal to two-thirds of any recoveries from third parties or the cost of any remediation work completed with a federal appropriation. Id. at *5 n.5.

The court considered the Settlement Agreement when it expressly stated that its assessment of the Consent Decree was based upon the fact that Citizens had agreed to pay "up to" $7.625

-28-

million as well as the possibility of Citizens's paying less than this amount.  Id.  The court however declined the request of some third and fourth parties that it "give equal consideration to the Settlement Agreement."  Id. at *5 n.6.  The court reasoned that it had reviewed the terms of the Settlement Agreement, that the Consent Decree would not be contingent on the Settlement Agreement, and that the Settlement Agreement "in no way 'trumps' the terms of the Consent Decree."[6]  Id.

As for procedural fairness, the court concluded that "as between the State, the City and Citizens, the Court is amply satisfied that the Consent Decree represents the end result of a procedurally fair, arm's-length negotiation process."  Id. at *6. The court rejected the contention of third and fourth parties that they were unfairly excluded from the settlement process, noting that the record was "devoid of any evidence, including any affidavits of counsel, suggesting that any third or fourth party asked to attend or participate in settlement talks . . . but were affirmatively excluded."  Id. at *7.  The court remarked that "[d]espite the lack of an invitation, the status reports undoubtedly put the third and fourth parties on notice that settlement discussions were ongoing.  Given that notice, these

---

[6]    The court also noted that the two sets of comments it received from the public during the comment period came from third and fourth parties.  The court stated that it had reviewed these comments and "determined that they do not require any discussion in the context of the pending Motion."  Id. at *5 n.7.

-29-

parties could have certainly requested the opportunity to participate." Id. The court further pointed out that "[a]lthough a global resolution might have been possible and even preferable, it is not surprising or unfair that the City and Citizens would reach a settlement without the participation of the third or fourth parties given the trifurcated nature of the proceedings." Id.

With respect to substantive fairness, the court noted that although there remains uncertainty about the total cost of the Dunnett's Cove remediation, it could still determine that the Consent Decree is substantively fair. The court pointed out that "[t]he First Circuit previously has endorsed the trial court 'confin[ing] its inquiry to the substantive fairness of the aggregate class contribution' without concerning itself as to how the members of the settling class have chosen to divvy up the various costs and risks." Id. (quoting Charles George Trucking, 34 F.3d at 1088-89) (citations and internal quotation marks omitted). It also noted that pursuant to the Consent Decree, "the City and Citizens have agreed to fund the entire remediation regardless of whether contribution is ever received from other parties or sources." Id. The court did compare the proportion of total projected costs to be paid by the settlors with the liability attributed to them in the Phase One Findings, see Charles George Trucking, 34 F.3d at 1087, and noted that "Citizens' contribution of $7.625 million roughly correlates to the Court's previous

equitable apportionment, especially when one considers the additional response costs [of $1.33 million] Citizens has already incurred." Bangor II, 2007 WL 1557426, at *7 n.11.

As for reasonableness, the court pointed out that the Consent Decree provides for a remedy "that would at least match (and may well exceed)" any remedy that might have been developed in a second phase trial. Id. at *8. The court also noted that by allowing the remedial process to begin without requiring further litigation, the Consent Decree would be efficient. Id. The court rejected the argument that the Consent Decree's remedy was not reasonable because it may exceed what the court would otherwise have required; the court pointed out that "nothing prevents the City and Citizens from agreeing to do more remediation than might be required by CERCLA and RCRA." Id. With respect to litigation positions, the court noted that "there was undoubtedly a good faith basis for continuing this litigation," but both sides realized that settlement would be a cost-effective solution. Id.

The court concluded that the Consent Decree was faithful to the purposes of CERCLA and RCRA, noting that this determination "clearly overlaps with the Court's assessment of reasonableness." Id. at *9.

L.      Ruling on Third- and Fourth-Party Motions for Judgment

The court then turned to the third and fourth parties' motions for judgment and deferred decision, observing that

"[f]ollowing entry of the Consent Decree, these arguments rest on a questionable premise and beg the question: to what extent, if at all, can the Court rely on its Phase One Findings of Fact and Conclusions of Law to make any decision regarding the viability of Citizens' outstanding claims against the Third Parties?" Id. The court requested briefing from the parties on this question.

With respect to Citizens's claims against the third parties, the court remarked that "it seems that Citizens now has a single CERCLA claim for contribution that is primarily governed by 42 U.S.C. § 9613(f)(3)(B)." Id. The court held that this claim "would be best pursued as an entirely new case." Id. at *10. The court noted that absent a "compelling objection," such a new case would also include the third and fourth parties' complaints. The court noted that its "interest in seeing these claims proceed as a separate case is driven primarily by pragmatic, docket management concerns." Id.

Various third and fourth parties filed motions for reconsideration of the court's rulings. Citizens filed a supplemental brief arguing that the court's Phase One Findings and Conclusions should not be considered the law of the case, noting that the court had never entered those as a final judgment, whereas it had entered the Consent Decree as a final judgment. Various third- and fourth-party defendants filed an opposing motion arguing that Citizens could not "unilaterally expunge the record

established over four years of litigation simply by entering a settlement after trial of the claims brought by and against it."

On July 20, 2007, the court denied the third and fourth parties' motions for reconsideration of its approval of the Consent Decree. The court noted that it was not "persuaded that the Third-Party and Fourth-Party Defendants are prejudiced by the entry of the Consent Decree as a final judgment. . . . [T]he entry of the Consent Decree as a final judgment will neither create unnecessary procedural complexities for the remaining action nor will it adversely affect orderly future proceedings or the expeditious final resolution of this matter."

M.      Instructions to Citizens To File Third-Party Complaints in a New Case

On July 20, 2007, the court denied Citizens's motion for leave to file supplemental third-party complaints in the existing case, given its preference that further proceedings be docketed as a new case. The court's order included the following language:

> After carefully considering the issues briefed by the parties, the Court finds that the Phase One Findings of Fact and Conclusions of Law are not binding on the Court or any of the parties to this litigation. Under the changed circumstances in the case, those findings and conclusions were superseded by the Settlement Agreement reached between the City of Bangor and Citizens and the Court approved Consent Decree between the State of Maine, the City of Bangor, and Citizens. As such, those findings and conclusions were never available for appellate review and, thus, never became final.

Accordingly, given that Citizens had expressed its willingness to file its supplemental third-party complaints as a new case and, the court concluded, there would not be any prejudice to the third parties, the court ordered that the supplemental third-party complaints be filed as a new case. The effect of the language quoted above is presented as a major issue in this appeal.

On November 28, 2007, the court granted Citizens's motion to dismiss its third-party claims without prejudice and deemed all of the pending third- and fourth-party motions for judgment moot and therefore dismissed all of them without prejudice. City of Bangor v. Citizen Commc'ns Co., No. 02-183, 2007 WL 4233094, at *1-2 (D. Me. Nov. 28, 2007).

On November 29, 2007, the district court issued a final judgment in which it entered judgment in favor of the United States Army Corps of Engineers with respect to Citizens's third-party claims and noted that the Amended Consent Decree (which did not involve any substantive changes from the proposed Consent Decree) had been entered as a final judgment.

II.

The appeal now before us is a consolidated appeal by the non-MGP parties (Barrett Paving, Honeywell International, Beazer East, Colas, Dead River Company, and the Speirs parties) of the district court's entry of the Consent Decree; the court's order that Citizens's motion to file supplemental claims and the third-

and fourth-party motions for judgment be dismissed without prejudice and refiled as a new case; and the July 20, 2007 order in which the court declared that its Findings of Facts and Conclusions of Law were "superseded" by the Consent Decree.

A.        The Consent Decree

Almost all of the law regarding approval of CERCLA consent decrees comes from cases in which the United States was a party. That is not our situation. It is worth considering the roles CERCLA sets forth in cases involving private parties and states.

CERCLA gives the federal government a role not given to the states. CERCLA enables the federal government to facilitate the cleanup of toxic waste sites. "As its name implies, CERCLA is a comprehensive statute that grants the President broad power to command government agencies and private parties to clean up hazardous waste sites." Key Tronic Corp. v. United States, 511 U.S. 809, 814 (1994).

Section 104 of CERCLA authorizes the President to undertake removal or other appropriate remedial action whenever a hazardous substance is released or there is a substantial threat of such release. 42 U.S.C. § 9604(a)(1). The President must promptly notify the appropriate state officials and seek to coordinate actions under this section with them. Id. § 9604(b)(2). The President cannot enter into remedial actions under this section

-36-

unless the state where the hazardous release first occurs enters into an agreement providing, inter alia, that it will assure all future maintenance of the removal and remedial action.  Id. § 9604(c)(3).

Section 106 of CERCLA permits the President, when he determines that there may be an "imminent and substantial endangerment to the public health or welfare," to require the Attorney General to seek an injunction in the federal district court in the district where the threat occurs.  Id. § 9606(a). Courts have held that this section applies only to the federal government, and so states and other entities are unable to seek injunctions under CERCLA.  Colorado v. Idarado Mining Co., 916 F.2d 1486, 1493 (10th Cir. 1990) (noting that "[c]ourts have adhered to the view that injunctions are not available to states and other non-federal plaintiffs under CERCLA" and collecting cases).

CERCLA also includes provisions that permit both states and private parties to recover cleanup costs and seek contribution from responsible parties and so provides further incentives for the remediation of hazardous waste sites.  Key Tronic, 511 U.S. at 816 (noting that CERCLA "expressly authorizes a cause of action for contribution in [§] 113 and impliedly authorizes a similar and somewhat overlapping remedy in [§] 107").

Congress has also recognized a special role for states in authorizing judicial approval for consent decrees in which the

state is a party, and then authorizing both contribution protection and contribution claims.  Under section 113 of CERCLA, co-liable parties may seek contribution from one another, and courts resolving such claims "may allocate response costs among liable parties using such equitable factors as the court determines are appropriate."  42 U.S.C. § 9613(f)(1).  Section 113 contains provisions that were added to CERCLA by the Superfund Amendments and Reauthorization Act ("SARA") of 1986, Pub. L. No. 99-499, 100 Stat. 1613; see also Key Tronic, 511 U.S. at 816.  These provisions give protection from contribution claims to parties that settle with the federal government or a state in a judicially or administratively approved settlement, and they grant contribution claims against non-settlors to these settling parties.  Section 9613(f)(2) provides: "A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement."  In addition, § 9613(f)(3)(B) provides: "A person who has resolved its liability to the United States or a State for some or all of a response action . . . in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement

. . . ." Congress thus authorized judicial approval of consent decrees entered into with states.[7]

States are given a special role in defining allowable costs and cleanup standards. Section 107 authorizes the recovery of costs expended in accordance with the National Contingency Plan ("NCP").[8] See 42 U.S.C. § 9607(a)(4)(B). Actions undertaken by the federal or a state government are presumed not to be inconsistent with the NCP; private plaintiffs have the burden of proving that their response actions are consistent with the NCP. See 1 A.J. Topol & R. Snow, Superfund Law and Procedure, § 1:2, at 10-11 (2007 ed.). Often that showing is met if the remediation work is carried out under the approval and monitoring of the appropriate state environmental agency. See, e.g., NutraSweet Co. v. X-L Eng'g Co., 227 F.3d 776, 791 (7th Cir. 2000); Esso Standard

_____

[7] It is not clear whether this statutory contribution protection extends to agreements entered into with parties other than the federal government or a state. See City of Detroit v. Simon, 247 F.3d 619, 628 (6th Cir. 2001) (there is no contribution protection for a party that entered into a settlement with Detroit because the city cannot be equated with the United States or a state, as the language of CERCLA requires); 2 A.J. Topol & R. Snow, Superfund Law and Procedure, § 7:91, at 181 (2007 ed.) ("Although the text of CERCLA is silent regarding the right of contribution protection for private party settlements, to facilitate settlement . . . a number of federal courts have interpreted CERCLA's language to include private parties . . . .").

[8] "The national contingency plan specifies procedures for preparing and responding to contaminations and was promulgated by the Environmental Protection Agency . . . pursuant to CERLCA § 105, 42 U.S.C. § 9605." Cooper Indus., Inc. v. Aviall Servs., Inc., 543 U.S. 157, 161 n.2 (2004); see also 40 C.F.R. § 300.

-39-

Oil Co. (P.R.) v. Rodríguez Pérez, No. 01-2012, 2004 WL 2238894, at *13 (D.P.R. 2004). The appellants here do not claim the Consent Decree does not comply with the NCP.

Section 121 specifies standards for cleanups conducted pursuant to CERCLA. Any such cleanup must comply with federal standards or more stringent state standards if they exist. 42 U.S.C. § 9621(d)(2)(A). States, in turn, are given the authority to enforce "any Federal or State standard, requirement, criteria, or limitation to which the remedial action is required to conform under this chapter in the United States district court for the district in which the facility is located." Id. § 9621(e). A number of provisions in section 121 relate to state involvement in cleanups, requiring the President to promulgate regulations to ensure that a state has "substantial and meaningful involvement" in the "initiation, development, and selection of remedial actions to be undertaken in that State." Id. § 9621(f)(1).

As to consent decrees, SARA also added provisions, in section 122, that authorize the President to enter into settlements with private parties and lay out procedures governing such settlements. See id. § 9622; 2 Topol & Snow, supra, § 7:89, at 155 (noting how the settlement process was "radically changed" by SARA, which "expressly authorized EPA to enter into settlement agreements with PRPs and provided both procedural and substantive direction concerning the forms that those settlements should take"). The

section 122 procedures include that any agreement between the United States and a PRP under section 122 is to be entered in the appropriate federal district court as a consent decree. Id. § 9622(d)(1)(A). At least thirty days before a final judgment is entered, the proposed settlement must be filed with the court and the Attorney General must provide an opportunity for persons not named as parties to the action to comment. Id. § 9622(d)(2)(A),(B). The Attorney General is to consider and file with the court any written comments. Id. § 9622(d)(2)(B). In this case the district court essentially followed these procedural requirements even though the United States was not a party.

The vast majority of the case law involving court approval of consent decrees involves cases in which the United States is a party. See, e.g., United States v. Davis, 261 F.3d 1 (1st Cir. 2001); Charles George Trucking, 34 F.3d at 1081; Cannons, 899 F.2d at 79. It is common for CERCLA consent decrees between or among private parties and a state also to be submitted for court approval. See, e.g., New York v. Panex Indus., Inc., No. 94-0400E, 2000 WL 743966, at *1 (W.D.N.Y. June 6, 2000); Kelley v. Wagner, 930 F. Supp. 293, 294-95 (E.D. Mich. 1996); State of Ariz. v. Motorola, Inc., 139 F.R.D. 141, 147 (D. Ariz. 1991).[9]

---

[9]    In Davis, 261 F.3d 1, after the initial phase of a CERCLA action between the United States and a PRP was resolved, there was a contribution litigation between private parties which was resolved by a settlement in the form of a judicially approved consent decree. In Davis we recognized several bases for the

Against this background we evaluate appellants' claims.

B.        Whether Appellants Have Standing To Challenge the Decree

We turn to the Consent Decree in this case, beginning with Citizens's argument that the appeal should be dismissed because the third and fourth parties lack standing to challenge the Decree.

Citizens points to case law establishing that "[a] nonsettling defendant does not ordinarily have standing to object to a court order approving a partial settlement since the nonsettling defendant is generally not affected by the settlement." In re Viatron Computer Sys. Corp. Litig., 614 F.2d 11, 14 (1st Cir. 1980).  That misses the point.  Here, the third and fourth parties are potentially affected by the settlement.  Citizens asserts, inter alia, that by virtue of the Decree alone, it has the right to collect from third parties under CERCLA section 113(f)(3)(B), which provides that an entity "who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or

authority of the district court to approve such a consent decree. One source was the fairly broad authority of courts to approve consent decrees recognized in Local No. 93, International Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501, 525 (1986). Davis, 261 F.3d at 22.  Another was to promote the objectives of CERCLA by facilitating the prompt remediation of hazardous waste sites, id., especially given that these claims arose from the original suit filed by the United States.  We also pointed out that it is permissible for consent decrees to provide relief broader than a court could have awarded after trial.  Id.

judicially approved settlement may seek contribution from any person who is not a party to a settlement."   42 U.S.C. § 9613(f)(3)(B).

Standing generally has two components: statutory and constitutional.  We do not understand Citizens's objection to be a challenge to statutory standing.  After all, our precedent under CERCLA has allowed a non-settling third party to challenge a consent decree entered into by a party that was seeking contribution from the third party.  Davis, 261 F.3d at 17-18.  Indeed, as described below, Citizens's position would undercut one of CERCLA's goals.

The Article III constitutional requirements for standing are "expressed in a familiar three-part algorithm: a would-be plaintiff must demonstrate a concrete and particularized injury in fact, a causal connection that permits tracing the claimed injury to the defendant's actions, and a likelihood that prevailing in the action will afford some redress for the injury."  Me. People's Alliance & Natural Res. Def. Council v. Mallinckrodt, Inc., 471 F.3d 277, 283 (1st Cir. 2006) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).  These components are easily satisfied on the facts here.  The third and fourth parties assert that the entry of the Consent Decree injures them because it opens the door for Citizens to seek contribution from third parties.

Moreover, it is well established that "a non-settling defendant has standing to object to a partial settlement which purports to strip it of a legal claim or cause of action, an action for indemnity or contribution for example." Waller v. Fin. Corp. of Am., 828 F.2d 579, 583 (9th Cir. 1987). "[B]ecause approval of a consent decree under CERCLA results in contribution protection to the settling party, it also affects the rights of PRPs who are not parties to the decree." United States v. Charter Int'l Oil Co., 83 F.3d 510, 515 (1st Cir. 1996). As Citizens acknowledges, the Consent Decree includes a provision that "Citizens and the City are entitled to protection from all contribution actions or claims for the matters addressed in this decree."

Further, as the third and fourth parties point out, the Decree does not extinguish Maine's claims "against any party other than Citizens for natural resource damages, or for response costs that overrun prior estimates." Indeed, CERCLA's permitting broad contribution protection for settling parties is "not a scrivener's accident"; it can provide a valuable incentive for parties to settle early. United Techs. Corp. v. Browning-Ferris Indus., Inc., 33 F.3d 96, 103 (1st Cir. 1994).

We reject the argument that appellants lack standing and get to the real issues.

C.        Standard of Review of the Consent Decree

CERCLA does not mandate a particular test for courts that have been asked to approve a consent decree under either 42 U.S.C. § 9622(d)(1)(A), when the United States is a party, or under the contribution section, id. § 9613(f), when a state is a party.  In suits involving the United States, courts have developed a three-pronged inquiry: is the decree "reasonable, faithful to the statute's objectives, and fair (both procedurally and substantively)"?  Charles George Trucking, 34 F.3d at 1084 (citing Cannons, 899 F.2d at 85).  This inquiry is similar to the one used by courts when reviewing consent decrees generally: "District courts must review a consent decree to ensure that it is 'fair, adequate, and reasonable; that the proposed decree will not violate the Constitution, a statute or other authority; [and] that it is consistent with the objectives of Congress . . . .'"  Conservation Law Found. of New England, Inc. v. Franklin, 989 F.2d 54, 58 (1st Cir. 1993) (quoting Durrett v. Hous. Auth. of Providence, 896 F.2d 600, 604 (1st Cir. 1990)); see also Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501, 512-13 (1986).

This court has not had the occasion to consider a consent decree involving a state rather than the federal government.  Other courts have applied the test articulated in Cannons and Charles

George Trucking to decrees involving states as parties.[10] See, e.g., Panex Indus., 2000 WL 743966, at *1; Kelley, 930 F. Supp. at 297; Motorola, Inc., 139 F.R.D. at 147. As explained below, the fact that the United States is not a party does affect the level of deference we apply.

An appellate court will overturn a district court's decision to approve the entry of a CERCLA consent decree in a case involving the United States "only for manifest abuse of discretion." Charles George Trucking, 34 F.3d at 1085. An abuse of discretion occurs when "a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them." Cannons, 899 F.2d at 84 (quoting Indep. Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co., 864 F.2d 927, 929 (1st Cir. 1988)) (internal quotation marks omitted).

---

[10] Some CERCLA suits are brought by private parties and the resulting settlements do not involve consent decrees. Courts have applied an analogous inquiry in determining whether to approve such private settlements, evaluating the "'fairness, adequacy and reasonableness' of private settlements by considering the criteria for apportionment between the parties, the public policy favoring settlements, the strength of the case, the amount of the settlement offer, and the like." 2 Topol & Snow, supra, § 7:91, at 181; see also Amoco Oil v. Dingwell, 690 F. Supp. 78, 85 (D. Me. 1988), aff'd sub nom. Travelers Indem. Co. v. Dingwell, 884 F.2d 629 (1st Cir. 1989).

In CERCLA settlements in cases involving the United States which have been approved by the district court, an appellate court applies two levels of deference. The first layer of deference is to the series of judgments made by the United States and its expert and experienced staff at the EPA in reaching a settlement. "[T]he first layer of insulation implicates the trial court's deference to the agency's expertise and to the parties' agreement." Cannons, 899 F.2d at 84.

The second layer of deference is to the trial court; "[b]ecause approval of a consent decree is committed to the trial court's informed discretion, the court of appeals should be reluctant to disturb a reasoned exercise of that discretion." Id. (citations omitted).

In this case, the agency involved was not the federal EPA, and so there can be no deference to the EPA. The question becomes what deference, if any, should be given to a state agency which is not charged with implementing CERCLA. We recognize the DEP does have a mandate under state law to "prevent, abate and control the pollution of the air, water and land and preserve, improve and prevent diminution of the natural environment of the State." Me. Rev. Stat. Ann. tit. 38, § 341-A.

Federal courts generally defer to a state agency's interpretation of those statutes it is charged with enforcing, but not to its interpretation of federal statutes it is not charged

with enforcing.  Bldg. Trades Employers' Educ. Ass'n v. McGowan, 311 F.3d 501, 507 (2d Cir. 2002); see also Idaho Dep't of Health & Welfare v. U.S. Dep't of Energy, 959 F.2d 149, 152 (9th Cir. 1992).

We choose to accord some deference to Maine's decision to sign onto the Consent Decree, but not the same amount of deference we would accord the EPA in a consent decree involving the United States.  We give deference in recognition that the state agency has some expertise.  This lesser deference does not displace the baseline standard of review for abuse of discretion.  Even if we gave the Maine DEP no deference, we would still find, on the facts here, no abuse of discretion.

D.        Merits of Challenge to Court Approval of Decree

Generally, two types of groups challenge CERCLA consent decrees: concerned local governments or citizens who believe that the decree is inadequate to ensure a proper cleanup, and PRPs who were not parties to the settlement and worry that they will be left to bear a disproportionate share of cleanup costs.  2 Topol & Snow, supra, § 7:92, at 185-86.  Here there can be no concern that the Decree is inadequate to ensure a proper cleanup since the settling parties are together covering one hundred percent of cleanup costs. Indeed, appellants do not challenge the reasonableness of that aspect of the Decree.

Rather, the appellants' primary concern appears to be that the terms of the Consent Decree will allow one of the settling

-48-

parties, Citizens, (a) to assert claims against them for contribution that they believe would have been barred by the court's earlier Phase One Findings and Conclusions; (b) to have contribution protection; and (c) to pay less than its fair share.

There is no real claim that the court operated under the wrong legal standard: the claim is that the court did not faithfully execute the standard.[11]

Appellants present four major arguments that the entry of the Decree was in error: (a) the district court did not conduct a sufficiently rigorous inquiry of the Settlement Agreement; (b) the Decree is not substantively fair because it is impermissibly favorable to Citizens; (c) the Decree is not procedurally fair because its material terms were negotiated privately and adopted without significant scrutiny by the State; and (d) the Decree violates CERCLA section 122.

### 1. Failure To Conduct Rigorous Scrutiny of the Settlement Agreement

The third and fourth parties argue that the district court should have conducted a more searching inquiry of the terms of the private Settlement Agreement before it approved the Decree.

---

[11] In a footnote, the third and fourth parties assert that Maine violated Fed. R. Civ. P. 24 by not filing a pleading with its motion to intervene, and they object to the district court's excusing this. Since this argument is presented only in a passing fashion in a footnote, we deem it to be waived. United States v. Van Anh, 523 F.3d 43, 53 n.8 (1st Cir. 2008). Even if the argument were not waived, there was no abuse of discretion in the district court's decision to elevate substance over form.

They are particularly concerned with the assignment of the City's third-party claims to Citizens and the arrangement through which Citizens can keep two-thirds of any recovery from third parties net of litigation costs.

The appellants' argument that the district court did not consider the terms of the Settlement Agreement is manifestly untrue. The court expressly stated that it <u>was</u> considering certain settlement terms from the Agreement, in particular the $7.625 million figure and the fact that Citizens might end up paying less than that amount because of its potential to recover from third parties through assignment and by contribution or benefit from federal payments. <u>Bangor II</u>, 2007 WL 1557426, at *5 nn.5-6.

The argument is made that the court was required to go farther than it did. The court quite properly considered the private Settlement Agreement to the extent it was germane to the scrutiny required of the Consent Decree. No more was needed. Private settlements usually "do not entail the judicial approval and oversight involved in consent decrees." <u>Buckhannon Bd. & Care Home, Inc.</u> v. <u>W. Va. Dep't of Health & Human Res.</u>, 532 U.S. 598, 604 n.7 (2001).

Appellants' argument then shifts in character to an argument that the court should have ruled, in the course of considering the Consent Decree, that any assignment of claims by the City in the private Settlement Agreement to Citizens was

invalid.[12]  The court very carefully said it was not then deciding the question of the enforceability of either these provisions or of the likelihood that Citizens would ultimately pay less than $7.625 million.  Bangor II, 2007 WL 1557426, at *5 n.5.  The decision by the district court not to resolve every issue that could arise from the later enforcement of the Consent Decree was correct.  See Charter Int'l Oil, 83 F.3d at 515-16.

The district court did not abuse its discretion by not scrutinizing the purported assignment to test its validity.

2.  Procedural Fairness

To gauge procedural fairness, "a court should ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance."  Cannons, 899 F.2d at 86.  Here, the district court concluded that "as between the State, the City and Citizens, the Court is amply satisfied that the Consent Decree represents the end result of a procedurally fair, arm's-length negotiation process."  Bangor II, 2007 WL 1557426, at *6.  The court also rejected the contention of third and fourth parties that they were unfairly excluded from the settlement process.  As a factual matter, the court noted that "[d]espite the lack of an invitation, the status reports undoubtedly put the third and fourth

---

[12]     The third and fourth parties argue that this assignment is barred by estoppel because the City had not timely asserted its claims against third parties, and the Phase One Findings and Conclusions were based on "the City's affirmative decision not to bring claims against third parties."

-51-

parties on notice that settlement discussion were ongoing." Id. at *7.

The EPA itself, when the United States institutes a CERCLA action, does not need to open settlement offers to all PRPs. Cannons, 899 F.2d at 93. It also does not need to spoon-feed them: "In the CERCLA context, the government is under no obligation to telegraph its settlement offers, divulge its negotiating strategy in advance, or surrender the normal prerogatives of strategic flexibility which any negotiator cherishes." Id.

The appellants focus here not on their exclusion from the settlement talks but rather on a series of arguments that the State's involvement was so cursory as to undermine the integrity of the procedures used. Specifically, they argue that the State was not sufficiently involved in the negotiation process, did not explain why the Decree differed from its prior administrative findings, and did not respond to the public comments it received about the Decree.

The claim is not supported by the record. The district court could properly credit Maine's representations that

> [t]he negotiations, which occurred in late 2006 through early 2007, included numerous meetings, telephone calls, and exchanges of draft consent decrees. Both DEP and the Maine Office of the Attorney General were actively involved in the negotiations. The State authored the first draft of the Consent Decree in late 2006.

Br. of Appellees State of Me. & Me. Dep't of Envtl. Prot. at 4 (citations omitted). The State also noted that the DEP will be significantly involved in the implementation of the Decree. For instance, Bangor has already submitted to the DEP a work plan for conducting pre-design studies, and the Decree includes a process for the proposal and consideration of modified remedies for the Site, under which the DEP will make determinations regarding which remedies or modified remedies will be implemented. Further, "[g]iven that the Consent Decree will result in the cleanup being performed and fully funded by responsible parties, the State's release of its present and future claims against Citizens is in no way an abdication of the State's responsibility to protect the public interest." Id. at 23.

Rather than address these facts, appellants try to leapfrog to an inference of procedural unfairness from a conclusion the State reached that they do not like. They argue the "extent of the State's abdication of responsibility is apparent from its statement that it had no obligation to look behind the combined financial commitment of the settling parties to fund the remediation." Br. of Appellants Barrett Paving Materials, Inc. et. al. at 55. This is essentially the same argument that the third and fourth parties make with respect to the district court: that the court should not have approved the Decree because Citizens was getting too beneficial a deal vis-à-vis Bangor. Maine's failure to

-53-

address this concern does not turn the State into a mere "bystander to negotiations of the substantive settlement terms."  Id.

Appellants fall back on an argument that the State's signing onto the Consent Decree was deficient because it was inconsistent with the State's prior position that Citizens was the party responsible for the contamination.  But, as the State notes, the June 2006 Phase One Findings and Conclusions were an "intervening event" between the DEP's March 2004 statement that "evidence points to the MGP as the primary or sole source of the tar plume" and its participation in drafting the Consent Decree. There was no inconsistency.

Appellants' last argument of procedural unfairness also fails.  It asserts that the State did not respond to public comments regarding the Decree, and that this violated CERCLA section 122, 42 U.S.C. § 9622(d)(2)(B).  Section 9622(d)(2)(B) does not apply to agreements to which the United States is not a party. Even if it did apply, it provides for comments by "persons who are not named as parties to the action."  Id.  The two comments received in this case were from third- and fourth-party defendants. Appellants can hardly claim they were not adequately heard.

The district court did not abuse its discretion by finding the Decree to be procedurally fair.

### 3. Substantive Fairness

We give deference to the trial judge's sense of the substantive fairness of the Decree, regardless of the fact that we do not have the EPA's assessment, but only the State's. Cf. Davis, 261 F.3d at 24. Usually, there is deference to the EPA's judgment on fairness, and no independent court inquiry. 2 Topol & Snow, supra, § 7:91, at 173-75.

Here, the court appropriately first reasoned, after its long history with the case, that it was "amply" satisfied that there was procedural fairness, that this contributed to its conclusion of substantive fairness, and that this Decree was substantively fair. Bangor II, 2007 WL 1557426, at *6-7.

The court calibrated the estimated total costs of the cleanup against the respective monetary liability being assumed by the City and Citizens. The court took notice that the DEP had previously estimated the range of possible cleanup costs to be between $13.2 million and $21.9 million. Id. at *7 n.11. The court noted that since the total costs of remediation were unknown, and the amount of contribution was unknown, both the City and Citizens were taking on risk. The cleanup, however, was guaranteed, as was the payment of response costs. Id. at *7.

Appellants argue that the court was obligated to do more. Specifically, they argue the fairness component is meant to provide them rigorous protection in the end from paying more than their

-55-

fair share.  From the point of view of the third and fourth parties, Citizens should not, with the total amount being unknown, be able to cap its liability at $7.625 million.

We think this is a misapprehension of the fairness doctrine.  The oft-cited language from cases where the United States is a party is that the substantive fairness inquiry involves "corrective justice and accountability, concentrating on 'the proposed allocation of responsibility as between settling and non-settling PRPs.'"  Davis, 261 F.3d at 24 (quoting Charles George Trucking, 34 F.3d at 1088).  Thus, the substantive fairness inquiry considers fairness in terms of both larger societal concepts such as corrective justice and fairness to non-settling parties.

Under SARA, Congress intended there to be some mechanism to police the EPA's conduct in settlements.  Congress enacted SARA in 1986 in order to "rein-in" the EPA; for instance, section 122 "contains detailed provisions that restrict EPA's freedom to conduct negotiations and to enter into CERCLA settlement agreements."  1 Topol & Snow, supra, § 1:3, at 14, 16; see also Cannons, 899 F.2d at 89 (acknowledging the possibility of coercive government settlement practices).  That concern about overseeing whether the EPA has been "fair" is not our concern here.

Further, this court has tended to treat private parties in CERCLA settlement cases as entities who can protect themselves, assuming the procedures are fair.  This circuit has stressed that

"[t]here is little need for a court to police the substantive fairness of a settlement as among settling parties of a particular class. Sophisticated actors know how to protect their own interests, and they are well equipped to evaluate risks and rewards." Charles George Trucking, 34 F.3d at 1088. Therefore, a court can "usually confine its inquiry to the substantive fairness of the aggregate class contribution, or, put another way, to the proposed allocation of responsibility as between settling and non-settling" parties. Id. As a result, it "would have served no useful purpose [for the district court] to go further and focus the lens of inquiry on the fairness of each class member's contribution." Id.

Settlements do not demand perfection. There are many factors involved. "[A] PRP's assumption of open-ended risks may merit a discount on comparative fault, while obtaining a complete release from uncertain future liability may call for a premium." Cannons, 899 F.2d at 88. Even more, this case exemplifies the principle that there is a need to suitably reward early settlements, particularly cost-effective ones. Id. Appellants have been excused from the costs of the Phase One litigation; they could have chosen to pursue settlement themselves, but chose not to do so. Here, the data used to apportion liability fell within "the broad spectrum of plausible appropriations." Id.

The district court's evaluation of substantive fairness was well within its discretion and this circuit's case law.

4.   Compliance with CERCLA Section 122

The district court did not abuse its discretion in concluding the Consent Decree complied with CERCLA. The appellants claim that the Decree violates CERCLA because it does not comply with 42 U.S.C. § 9622(f)(6)(A), which requires that a covenant not to sue include an exception allowing the President to sue for future liability that arises out of new developments, because it provides for an unconditional release of future liability for Citizens. The parties dispute whether the third and fourth parties waived this argument by not sufficiently presenting it below. Regardless of whether it was waived, the argument fails.

Section 122 of CERCLA plainly applies to settlements involving the United States, and the third and fourth parties have presented no convincing argument why we should disregard the clear language of the statute and extend it to settlements involving states and state agencies. See Arizona v. Components Inc., 66 F.3d 213, 217 (9th Cir. 1995) (noting that provisions of section 122 are "not applicable to state settlements in which the EPA is not involved"). The purpose of CERCLA section 122 is both to authorize the President to enter into agreements with persons to perform response actions and to impose specific restrictions on his doing so. There is no evidence that Congress intended for states to be

similarly restricted in entering into consent decrees.[13]  Even so, the Consent Decree here does give parallel protection to the State. If there are new problems at the Site in the future, Maine is entitled to seek additional costs from the City if necessary.

### III.

We turn to the remaining challenges, including appellants' concerns about the role of the Phase One Findings and Conclusions.  The challenge is to the district court's denial of the non-MGP parties' motions for judgment on Citizens's third-party claims on the grounds not of the merits, but on mootness because the claims would be heard in the new lawsuit.  The appellants also object to certain language the district court used.  We will assume there is appellate jurisdiction.  Appellants' arguments can be grouped together, and have two themes.

In the first, appellants say they were entitled to have judgment entered in their favor on their motions for judgment and it was therefore wrong of the court to have allowed Citizens to file contribution claims in a new action against them.[14]  They also

---

[13]  The appellants cite only one case, from the District of Utah, which held that the section 122 consent not to sue requirement should apply to agreements involving states. <u>Utah</u> v. <u>Kennecott Corp.</u>, 801 F. Supp. 553, 569 n.20 (D. Utah 1992). However, in a subsequent decision, the same court reached the opposite conclusion about the applicability of section 122 to agreements involving states. <u>Utah</u> v. <u>Kennecott Corp.</u>, 232 F.R.D. 392, 399 (D. Utah 2005).

[14]  There is no need to address Citizens's argument that the appellants lack standing to challenge the dismissal of their

argue they are entitled to judgment because any assignment of claims against them must be invalid. There was no error.

A district court enjoys inherent power to "control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." Landis v. N. Am. Co., 299 U.S. 248, 254 (1936); Taunton Gardens Co. v. Hills, 557 F.2d 877, 879 (1st Cir. 1977). Here, the district court decided that the entire subject matter to which the motions for judgment applied would be heard in a new case, where Citizens's opposing motion to file supplemental claims for contribution would also be considered. Appellants have not shown they would suffer the "plain legal prejudice" that parties seeking to challenge a dismissal without prejudice must demonstrate. Doe v. Urohealth Sys. Inc., 216 F.3d 157, 160-61 (1st Cir. 2000).

The problem of a consent decree not resolving all matters of interpretation which may be relevant in later contribution actions is not a new one. In Charter International Oil, this court held that in approving a consent decree with the EPA under CERCLA, the district court must address only so many issues "as needed to rule on the decree's fairness, reasonableness and fidelity to the statute." Charter Int'l Oil, 83 F.3d at 515-16. We also noted

---

motions for judgment because there has been no adverse decision against them, only a dismissal without prejudice. This argument is foreclosed by circuit precedent. See Mirpuri v. ACT Mfg., Inc., 212 F.3d 624, 628 (1st Cir. 2000); see also, e.g., Doe v. Urohealth Sys. Inc., 216 F.3d 157, 160 (1st Cir. 2000).

that there could be prudential reasons for the district court not to resolve more than necessary. Id. The district court, as we understand it, astutely followed this course and did no more than necessary. Thus, the court was under no obligation to rule on appellants' motions for judgment[15] before it approved the Consent Decree. Appellants may reassert their motions in the new litigation.

In their second theme, appellants fear that the court's actions have deprived them of an argument they wish to make in the new action based on their interpretation of the court's Phase One Findings and Conclusions. They worry about language in the court's order of July 20, 2007 that the Phase One Findings and Conclusions have been "superseded" by the entry of the Consent Decree: "Under the changed circumstances in the case, those findings and conclusions were superseded by the Settlement Agreement reached between the City of Bangor and Citizens and the Court approved Consent Decree between the State of Maine, the City of Bangor, and Citizens." Appellants fear that this language precludes them from making an argument that since judgment was entered for the Army Corps of Engineers in 2004, they are entitled to have judgment entered on parallel reasoning in the existing lawsuit.

---

[15] Nothing in the law of the case doctrine dictates the order in which a court addresses issues.

We view this language in the court's order as primarily being directed at the difference in allocations between Citizens and Bangor in the Phase One Findings and the Consent Decree. The court, in an abundance of caution, was making clear that the Consent Decree, and not the Phase One Findings, governed as to allocations between the settling parties. The court's orders made it perfectly clear it was not, in Phase One, ruling on the liability of the third- and fourth-party defendants.

Since the district court has never ruled on appellants' motion for entry of judgment, the law of the case doctrine plays no role. Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 815-16 (1988); Quern v. Jordan, 440 U.S. 332, 348 n.18 (1979); Fiori v. Truck Drivers, Local 170, 354 F.3d 84, 90 (1st Cir. 2004). Similarly, the court never ruled on the effect of the Phase One Findings on third-party defendants and expressly reserved that issue. Even if it had made such rulings, the law of the case doctrine does not prevent a judge from changing his mind, so long as there was an explanation and the court took into account justified reliance. Fiori, 354 F.3d at 90.

To the extent appellants may be arguing, contrary to the record, that the Phase One Findings were a final judgment, the district court was plainly correct. No final judgment was entered in Phase One.

IV.

We affirm the district court's entry of the Consent Decree and its dismissal without prejudice of the third and fourth parties' motions for judgment and its allowance of Citizens's motion to file supplemental claims in new litigation.

Affirmed.  Costs are awarded to appellees.